## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CANDELARIO HERRERA-VASQUEZ,

      Petitioner,

v.                           Case No. 8:18-cv-422-WFJ-TGW

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.
_____/

### ORDER

Candelario Herrera-Vasquez, a Florida prisoner, timely filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1.) Upon consideration of the petition (*id.*), the supporting memorandum (Doc. 2), the response and supplemental response (Docs. 11, 21), and the reply to the supplemental response (Doc. 25), the petition is denied.

### Procedural History

The State of Florida charged Mr. Herrera-Vasquez with one count of first-degree premeditated murder. (Doc. 11-2, Ex. 1, Vol. I, p. 60.) A state court jury convicted Mr. Herrera-Vasquez as charged, and the state trial court sentenced him to life in prison. (Doc. 11-5, Ex. 1, Vol. IX, pp. 1011-12; Doc. 11-6, Ex. 2.) After the state appellate court *per curiam* affirmed the conviction and sentence on direct appeal, Mr. Herrera-Vasquez sought postconviction relief under Florida Rule of Criminal

Procedure 3.850. (Doc. 11-6, Exs. 6, 8.) The state court summarily denied his postconviction motion, and the state appellate court *per curiam* affirmed the denial. (Doc. 11-6, Exs. 9, 11.)

### Facts[1]

Mr. Herrera-Vasquez and his girlfriend, Carmen Zuniga, lived in an apartment in Tampa, Hillsborough County, Florida, with three other roommates: Edmundo Hernandez, Oscar Gomez, and Juan Matias Sebastian-Recinos. Mr. Herrera-Vasquez did not like his given first name, Candelario, and went by Alejandro. His roommates called him Alejandro.

On the evening of Friday, July 20, 2012, Mr. Herrera-Vasquez, Zuniga, and several friends gathered at the apartment. Except for Zuniga, those present were drinking alcohol. Sebastian-Recinos and Hernandez were out but returned sometime between 9:00 and 11:00 p.m. They also had been drinking alcohol. After Sebastian-Recinos spilled beer in the living room, he and Mr. Herrera-Vasquez began to argue and shove each other.

They moved outside, and the fight escalated. Mr. Herrera-Vasquez was more intoxicated than Sebastian-Recinos and had trouble standing up in his sandals. Mr. Herrera-Vasquez fell to the ground and Sebastian-Recinos kicked him and hit him in the head. After the others separated them, Sebastian-Recinos left the apartment. Mr. Herrera-Vasquez went to bed in the room he shared with Zuniga. Before he fell asleep,

---

[1] This factual summary is based on the trial transcript.

2

Mr. Herrera-Vasquez told Zuniga that he was going to stab Sebastian-Recinos and that Sebastian-Recinos was going to pay. Zuniga fell asleep in the early morning hours. At some point that night, Sebastian-Recinos returned to the apartment and fell asleep in another bedroom.

At about 6:00 a.m. the next morning, Saturday, July 21, 2012, Zuniga awoke to Mr. Herrera-Vasquez asking her where his shorts were. She found the shorts and gave them to Mr. Herrera-Vasquez. Mr. Herrera-Vasquez took a credit card from his wallet, and picked up the machete he kept in the bedroom. When Zuniga asked Mr. Herrera-Vasquez what he was doing, he put his finger up to his mouth to indicate that she should be quiet.

Mr. Herrera-Vasquez left the bedroom. Seconds later, Zuniga heard the credit card jimmying a locked door, and then heard the machete hitting Sebastian-Recinos. She did not hear Sebastian-Recinos say anything. Zuniga went into the other bedroom. She grabbed onto Mr. Herrera-Vasquez but he demanded that she let go of him. Zuniga saw Mr. Herrera-Vasquez hit Sebastian-Recinos with the machete on his head and neck. When Mr. Herrera-Vasquez stopped, he said, "Don't mess with me. He should have never messed with me." (Doc. 11-4, Ex. 1, Vol. V, p. 401.)

Zuniga tried to wake their other roommates, Edmundo Hernandez and Oscar Gomez, but they were passed out drunk and were unresponsive. Back in their bedroom, Mr. Herrera-Vasquez cleaned the machete with one of Zuniga's shirts. Mr. Herrera-Vasquez smelled the machete and said that it smelled good. Mr. Herrera-Vasquez insisted to Zuniga that they leave. He told her to collect his photo album and

3

all of his personal papers that contained his legal name. Because they did not have transportation, Zuniga called her mother to come from Sarasota to get them. Before they left the apartment, Mr. Herrera-Vasquez put the machete in his pants. Zuniga and Mr. Herrera-Vasquez walked to a laundromat, where Zuniga's mother and her mother's boyfriend picked them up.

On the drive to Sarasota, Zuniga's mother asked why they wanted to be picked up so early in the morning. Mr. Herrera-Vasquez responded that he had cut Sebastian-Recinos in the face and killed him. Mr. Herrera-Vasquez said that he and Sebastian-Recinos fought the night before and that Sebastian-Recinos threatened him. He said that Sebastian-Recinos messed with the wrong person and had to pay for what he did. After arriving in Sarasota, Mr. Herrera-Vasquez wrapped the machete in plastic bags and threw it in a dumpster at the apartment complex where Zuniga's mother lived. Mr. Herrera-Vasquez bought a bus ticket to Mexico. The bus was scheduled to leave the next day, Sunday, July 22, 2012.

Meanwhile, Edmundo Hernandez and Oscar Gomez, the other roommates, had discovered Sebastian-Recinos's body during the day on Saturday. When police responded and learned that Mr. Herrera-Vasquez and Zuniga were missing, police unsuccessfully attempted to locate them in Sarasota. On the afternoon of Sunday, July 22, 2012, Zuniga, her mother, and her mother's boyfriend left Mr. Herrera-Vasquez at the bus station and drove to the Sarasota County Sheriff's Office. They had been too afraid to contact law enforcement earlier. Zuniga told officers which bus Mr. Herrera-

4

Vasquez was on and that the bus was scheduled for a dinner stop in Ocala, Marion County, Florida.

Mr. Herrera-Vasquez was taken into custody in Ocala. Detective Jose Lugo and Sergeant Baumann of the Hillsborough County Sheriff's Office arrived in Marion County, and Detective Lugo interviewed Mr. Herrera-Vasquez at the Marion County Sheriff's Office. Mr. Herrera-Vasquez told Detective Lugo that he killed Sebastian-Recinos. He stated that Sebastian-Recinos had hit and kicked him, and had also threatened his life.

The Sarasota County Sheriff's Office recovered the machete from the apartment complex dumpster. DNA testing showed that Sebastian-Recinos's blood was still on the machete. The associate medical examiner, Dr. Leszek Chrostowski, found cuts on Sebastian-Recinos's head and neck. The injuries were inflicted with a sharp and heavy object, and with enough force to cut through several of Sebastian-Recinos's teeth and to cut through his neck to his spine. Dr. Chrostowski determined Sebastian-Recinos's cause of death to be "fractures of the skull with cut wounds of the brain and transections of the left jugular veins and carotid and vertebral arteries due to multiple chop wounds of head and neck." (Doc. 11-5, Ex. 1, Vol. VIII, p. 831.)

### Standards of Review

### The AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the

5

Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on

the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed Mr. Herrera-Vasquez's conviction and sentence without discussion. This decision warrants deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

**Ineffective Assistance Of Counsel**

Mr. Herrera-Vasquez alleges ineffective assistance of trial counsel. Ineffective assistance of counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id.* at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. But "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* The

7

*Strickland* standard is "highly deferential" to defense counsel's performance. *Richter*, 562 U.S. at 105.

Mr. Herrera-Vasquez must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To demonstrate prejudice, Mr. Herrera-Vasquez must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

### Exhaustion Of State Remedies; Procedural Default

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). To establish cause for a procedural default, a petitioner

"must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). To establish prejudice, a petitioner "must show that there is at least a reasonable probability that the result of the proceeding would have been different." *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson*, 353 F.3d at 892.

## Discussion

### Grounds One and Three: Mr. Herrera-Vasquez's Statements to Detective Lugo

#### Ground One

Mr. Herrera-Vasquez argues that the state court violated his Fifth Amendment rights by denying his motion to suppress the incriminating statements he made to Detective Lugo at the Marion County Sheriff's Office. Mr. Herrera-Vasquez contends that he made the statements while in custody without the benefit of warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966). Shortly after the interview started, but before *Miranda* warnings were provided, Detective Lugo began asking questions of Mr. Herrera-Vasquez:

    [Q]:      Um. What is your name sir?

    [A]:      Candelario.

    [Q]:      Candelario. Candelario what?

9

[A]:       Vazquez-Herrera.[2]

[Q]:       Where were you going?

[A]:       To Mexico.

[Q]:       You are going to Mexico, why?

[A]:       Because the dude that you are going to ask me about, I killed him. There's no need for you to ask me.

[Q]:       Ok.

[A]:       Why I killed him? Because he hit me. Look how he left me here. Look at my head, he kicked me here. He told me that he was going to kill me, so I killed him. The only one to blame is me. Nobody is at fault.

[Q]:       Ok. Um, mm, I know what you just told me.

[A]:       Yes.

[Q]:       Ok, um. You have rights and I'm going to read them to you and then we will be able to talk.

[A]:       Of course.

(Doc. 2-2, Ex. B, p. 2.)

Detective Lugo then asked Mr. Herrera-Vasquez who Alejandro Vasquez was, and Mr. Herrera-Vasquez explained that Alejandro was his nickname and that his roommates knew him as Alejandro. (*Id.*, pp. 3-4.) He also stated that Sebastian-Recinos hit him, and he had no other way out. (*Id.*, p. 3.) Mr. Herrera-Vasquez was given *Miranda* warnings and asked for an attorney. (*Id.*, pp. 4-6.)

---

[2] Some portions of the record contain the names "Vazquez-Herrera" or "Vazquez." In this order, the Court uses "Herrera-Vasquez," the name under which Mr. Herrera-Vasquez filed his petition, except in quoting this part of the record.

At the suppression hearing, Detective Lugo testified that sometime during the late afternoon on Sunday, July 22, 2012, he received a call from Sergeant Baumann asking him to interview a suspect who spoke Spanish. (Doc. 11-2, Ex. 1, Vol. I, pp. 152-53.) Detective Lugo had not been involved in the investigation and did not know what had happened the day before. (*Id.*) On the drive to Marion County, Detective Lugo received a phone call from Hillsborough County officers identifying the suspect's name as Alejandro Vasquez. (*Id.*, pp. 154-55.) Detective Lugo did not receive a photograph of the suspect. (*Id.*, p. 155.)

When he arrived in Marion County, Detective Lugo testified, he heard for the first time that the individual said his name was Candelario. (*Id.*, p. 157.) Detective Lugo testified that he was uncertain whether the right person was detained. (*Id.*, pp. 157, 164-65.) Detective Lugo testified that this individual's reason for traveling to Mexico was relevant to ascertaining his identity, and that his intention was to identify the detained individual. (*Id.*, pp. 163-64, 177-79.)

At the end of the hearing, the state trial court denied Mr. Herrera-Vasquez's motion to suppress:

> Well, first, I do find that the [sic] Detective Lugo's testimony credible. And I understand the argument the defense is making, but I do not think the questions posed to the defendant under those circumstances were designed to confront him with any kind of incriminating evidence or elicit any type of incriminating statement. Given the name confusion, and the fact that there were questions as to identity, and he was seeking in good faith I think to identify who this person was, I don't know that one could reasonably anticipate he would blurt out a confession in response to that question. Therefore, I'm not going to . . . grant the motion to suppress.

(*Id.*, p. 196.)

11

The state appellate court affirmed the denial without comment. Thus, this Court looks through the state appellate court's decision to the state trial court's reasoning in reviewing the decision under the AEDPA. *Wilson*, 584 U.S. at 125.

Mr. Herrera-Vasquez has not shown that the state court's decision was unreasonable. *Miranda* holds that under the Fifth Amendment, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. "[T]the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

Mr. Herrera-Vasquez was directly questioned while in custody. But routine questions that "are 'requested for record-keeping purposes only' and therefore 'appear reasonably related to the police's administrative concerns . . . fall outside the protections of *Miranda* and the answers thereto need not be suppressed.' " *Everett v. Sec'y, Fla. Dep't of Corr.*, 779 F.3d 1212, 1242 n.14 (11th Cir. 2015) (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 601-02 (1990)); *see also United States v. Sweeting*, 933 F.2d 962, 965 (11th Cir. 1991) (stating that "[a]n officer's request for routine information for booking purposes is not an interrogation under *Miranda*, even though that information turns out to be incriminating" (internal quotation marks and citation

12

omitted)). But the questions must not be intended to induce incriminating responses. *Sweeting*, 933 F.2d at 965; *United States v. Glen-Archila*, 677 F.2d 809, 816 (11th Cir. 1982).

Mr. Herrera-Vasquez does not rebut, by clear and convincing evidence, the presumption of correctness afforded to the state court's finding that Detective Lugo's testimony was credible. *See Rolling v. Crosby*, 438 F.3d 1296, 1301 (11th Cir. 2006). Based on this testimony, the state court concluded that Detective Lugo asked questions in a good-faith effort to verify the identity of the person he was assigned to interview. Detective Lugo had limited information about the case when he started the interview. To his knowledge, the suspect was initially identified by one name, but the person who was detained gave police a different name.

Under these circumstances, Mr. Herrera-Vasquez fails to show that the state court unreasonably concluded that Detective Lugo asked the questions merely to clarify Mr. Herrera-Vasquez's identity and confirm that police arrested the right person, and that Detective Lugo's questions were not designed to confront Mr. Herrera-Vasquez with incriminating evidence or elicit an incriminating statement. Thus, *Miranda* was inapplicable to this portion of the interview. Mr. Herrera-Vasquez has not established that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law or was based on an unreasonable factual determination.

Further, even if the statements should have been suppressed, Mr. Herrera-Vasquez would not be entitled to federal habeas relief. Any constitutional error in

13

admitting Mr. Herrera-Vasquez's statements to Detective Lugo must be considered under the harmless-error test outlined in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Federal habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.' " *Id.* at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)). To find actual prejudice, a federal habeas court must conclude that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

Mr. Herrera-Vasquez told Detective Lugo that he killed Sebastian-Recinos because Sebastian-Recinos injured him in the fight and threatened him. But the jury heard through other evidence that Mr. Herrera-Vasquez admitted to the murder and explained his reasons for killing Sebastian-Recinos. He told his girlfriend Carmen Zuniga sometime after the fight that he was going to stab Sebastian-Recinos and that Sebastian-Recinos was going to pay. (Doc. 11-4, Ex. 1, Vol. V, p. 393.) And after Zuniga witnessed Mr. Herrera-Vasquez strike Sebastian-Recinos with the machete, he told Zuniga that Sebastian-Recinos should not have messed with him. (*Id.*, p. 401.) Mr. Herrera-Vasquez said to Zuniga, her mother, and her mother's boyfriend that he killed Sebastian-Recinos, that Sebastian-Recinos had fought with Mr. Herrera-Vasquez and threatened to kill him, and that Sebastian-Recinos had messed with the wrong person and was going to pay. (*Id.*, pp. 415-16, 469, 477, 487-88.)

Thus, Mr. Herrera-Vasquez's statements to Detective Lugo did not reveal incriminating information that the jury otherwise would not have learned. Mr.

14

Herrera-Vasquez has not shown that any error in admitting these statements had a substantial and injurious effect or influence on the jury's decision, as he must to obtain federal habeas relief under *Brecht*. Mr. Herrera-Vasquez is not entitled to relief on Ground One.

Ground Three

Mr. Herrera-Vasquez argues that trial counsel was ineffective for failing to move for a mistrial when evidence adduced at trial "proved" that Detective Lugo testified falsely at the suppression hearing that he did not know Mr. Herrera-Vasquez's identity before the interview. (Doc. 1, p. 8.)

Mr. Herrera-Vasquez concedes that this claim is unexhausted because he did not raise it in his state court postconviction proceeding. He contends that the resulting procedural default should be excused because he meets the cause and prejudice exception under *Martinez v. Ryan*, 566 U.S. 1 (2012). *Martinez* allows for federal habeas review of some procedurally defaulted claims of ineffective assistance of trial counsel if there was no counsel in the initial-review collateral proceeding in state court. *Id.* at 17. To excuse a procedural default under *Martinez*, the petitioner must show that the defaulted ineffective assistance of trial counsel claim "is a substantial one, which is to say that [he] must demonstrate that the claim has some merit." *Id.* at 14. A claim that lacks merit or is wholly without factual support is not substantial. *Id.* at 15-16.

Mr. Herrera-Vasquez has not established a substantial claim of ineffective assistance of trial counsel. As addressed, at the suppression hearing, Detective Lugo testified that he was unsure of the detained individual's identity at the start of the

interview. Mr. Herrera-Vasquez contends that the trial testimony of three law enforcement witnesses shows that Detective Lugo's testimony was untrue. First, Corporal Brandon Fitzgerald of the Hillsborough County Sheriff's Office testified at trial that he and several Sarasota County detectives learned Mr. Herrera-Vasquez's "real" name from Carmen Zuniga's interview with police. (Doc. 11-4, Ex. 1, Vol. VII, p. 652.) Corporal Fitzgerald also testified that he contacted Detective Lugo and Sergeant Baumann about going to Ocala. (*Id.*, pp. 653-54.)

Next, Deputy Kevin Blakely of the Sarasota County Sheriff's Office testified that initially he believed the suspect's name was Alejandro Vasquez, but that he learned from Carmen Zuniga that his name was Candelario Herrera-Vasquez. (*Id.*, pp. 662, 667.) Finally, Corporal Clifford Whiteside of the Marion County Sheriff's Office testified that officers originally looked for the name Alejandro Vasquez on the bus's passenger list, but that after speaking with Hillsborough County officers, he received the suspect's "current name." (*Id.*, p. 707.)

This trial testimony does not establish that Detective Lugo testified untruthfully at the suppression hearing. Other officers' testimony that they learned the suspect's "real" or "current" name during the investigation does not show that Detective Lugo in fact knew the individual's identity when he began the interview.

In Florida, "[a] motion for a mistrial should only be granted when an error is so prejudicial as to vitiate the entire trial." *England v. State*, 940 So.2d 389, 401-02 (Fla. 2006); *see also Cole v. State*, 701 So.2d 845, 853 (Fla. 1997) (stating that a motion for a mistrial should be granted only when "necessary to ensure that the defendant receives

a fair trial"). Mr. Herrera-Vasquez has not established that counsel had a viable basis to seek a mistrial, or a reasonable probability that the motion would have been granted.

Thus, Mr. Herrera-Vasquez has not presented a substantial claim of ineffective assistance of trial counsel for failing to seek a mistrial. The cause and prejudice exception, as addressed in *Martinez*, does not excuse the procedural default of this claim. Nor is the default excused by the fundamental miscarriage of justice exception. As Mr. Herrera-Vasquez has not overcome the procedural default, Ground Three affords him no relief.

**Ground Two: Theory of Defense**

Mr. Herrera-Vasquez contends that trial counsel was ineffective for presenting a defense of self-defense. In Florida, the use of deadly force "is justifiable when a person is resisting any attempt to murder such person or to commit any felony upon him or her or upon or in any dwelling house in which such person shall be." § 782.02, Fla. Stat. The jury was therefore instructed that "the use of deadly force is justifiable only if the defendant reasonably believes that the force is necessary to prevent imminent death or great bodily harm to himself while resisting . . . [a]nother's attempt to murder him, or . . . any attempt to commit aggravated assault upon him." (Doc. 11-5, Ex. 1, Vol. VIII, p. 984.) The jury was also instructed that to justify the use of deadly force, "the appearance of danger must have been so real that a reasonably cautious and prudent person under the same circumstances would have believed that the danger could be avoided only upon the use of that force." (*Id.*, pp. 985-86.)

In arguing that Mr. Herrera-Vasquez acted in self-defense, counsel addressed Mr. Herrera-Vasquez's statements that Sebastian-Recinos beat him up during the fight and threatened to kill him, and that Mr. Herrera-Vasquez had no other way out. (Doc. 11-5, Ex. 1, Vol. IX, p. 966-67.) Counsel also addressed testimony that Sebastian-Recinos became violent when he drank, and questioned whether Mr. Herrera-Vasquez realized how much time had passed when he woke up on Saturday morning. (*Id.*, pp. 967-68.)

Mr. Herrera-Vasquez argues that this defense was frivolous considering the hours-long gap between the fight and the murder. Mr. Herrera-Vasquez asserts that counsel should have argued that his actions constituted the lesser offense of either second-degree murder or manslaughter "due to his heavy alcohol consumption that day and the difficulties which Petitioner and the decedent had recently experienced." (Doc. 1, p. 7.)

Mr. Herrera-Vasquez has not established a reasonable probability of a different outcome had counsel argued that the evidence only showed either second-degree murder or manslaughter. Mr. Herrera-Vasquez's argument does not account for the State's strong evidence of premeditation. First-degree premeditated murder is defined as the "unlawful killing of a human being" that is "perpetrated from a premeditated design to effect the death of the person killed or any human being." § 782.04(1)(a)(1), Fla. Stat. "Premeditation is a fully-formed conscious purpose to kill, which exists in the mind of the perpetrator for a sufficient length of time to permit reflection." *Sanders v. State*, 318 So.3d 605, 611 (Fla. 1st DCA 2021). Premeditation "can form in a

18

moment and need exist only for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act." *Id.*

Here, evidence of premeditation included Mr. Herrera-Vasquez's statements to Carmen Zuniga after the fight that he was going to stab Sebastian-Recinos and that Sebastian-Recinos was going to pay; Mr. Herrera-Vasquez's similar statements after the murder that Sebastian-Recinos should not have "messed" with him and had to pay for what he did; Mr. Herrera-Vasquez's signaling to Zuniga to keep quiet before using the credit card to unlock the door to the room where Sebastian-Recinos was sleeping; his striking Sebastian-Recinos's head and neck with a machete; and his commission of these acts hours after the fight.

By convicting him as charged, the jury found that the State's evidence proved that Mr. Herrera-Vasquez acted with a premeditated design to kill Sebastian-Recinos. Mr. Herrera-Vasquez does not show a reasonable probability that if counsel had not raised self-defense, the jury would have found that this same evidence fell short of establishing premeditation and would have convicted him of a lesser offense. *See Peoples v. State*, 251 So.3d 291, 302 (Fla. 1st DCA 2018) ("The essential distinction between first and second degree murder is the absence of the element of premeditation in second degree murder."); *Knight v. State*, 267 So.3d 38, 45-46 (Fla. 1st DCA 2018) (explaining that manslaughter by act does not include the element of intent to kill).

Finally, contrary to Mr. Herrera-Vasquez's argument, counsel could not rely on his voluntary intoxication to argue that he was guilty of a lesser offense. *See* § 775.051, Fla. Stat. ("Voluntary intoxication resulting from the consumption . . . of alcohol . . .

19

is not a defense to any offense proscribed by law. Evidence of a defendant's voluntary intoxication is not admissible to show that the defendant lacked the specific intent to commit an offense[.]"). Mr. Herrera-Vasquez has not overcome the procedural default of the claim in Ground Two by showing cause and prejudice under *Martinez*. The fundamental miscarriage of justice exception does not apply to excuse the procedural default. As the claim remains procedurally defaulted, Mr. Herrera-Vasquez is not entitled to relief on Ground Two.

Accordingly, the Court **ORDERS**:

1. Mr. Herrera-Vasquez's petition (Doc. 1) is **DENIED**.

2. The **CLERK** shall enter judgment accordingly and is directed to **CLOSE** this case.

3. Mr. Herrera-Vasquez is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). The district court or circuit court of appeals must issue a certificate of appealability. "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability, Mr. Herrera-Vasquez must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Mr. Herrera-Vasquez has not made the requisite showing. Because Mr.

Herrera-Vasquez is not entitled to a certificate of appealability, he is not entitled

to appeal *in forma pauperis.*

**DONE AND ORDERED** in Tampa, Florida, on _____8 / 9_____, 2024.


_____

**WILLIAM F. JUNG**
**United States District Judge**